# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 99 C 0004 | DATE | 3/25/2004 |
| CASE TITLE | Anderson vs. City of Chicago | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendants Motions for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons given in the attached memorandum opinion, the Motions for Summary Judgment filed by the Defendant Officers [Doc. 76] and the Defendant City of Chicago [Doc. 79] are granted. Any and all other pending motions are moot and terminated. This case is closed.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | Document Number |
|---|---|---|---|
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | MAR 2 9 2004 | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | 88 |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| jar(lc) | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
MAR 2 9 2004

| | |
|---|---|
| GORDON ANDERSON )<br>CRYSTAL ANDERSON )<br>    Plaintiffs, )<br>)<br>v. )<br>)<br>CITY OF CHICAGO, et al )<br>)<br>)<br>    Defendants, ) | No. 99 C 0004<br><br>HONORABLE DAVID H. COAR |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Gordon and Crystal Anderson filed this action in January 1999. Their Complaint was subsequently amended twice, most recently in July 2002. It is the Second Amended Complaint ("Complaint") that now sets forth Plaintiff's allegations in this case. This Complaint contains two counts. Count I states a claim that the conduct of the Defendant Police Officers violated both Plaintiffs rights under the Fourth Amendment. Count II alleges that the Defendant City of Chicago violated Plaintiff Gordon Anderson's due process rights when it destroyed his antique firearm collection in advance of his trial.

The case comes before the Court now on the Defendants' Motions for Summary Judgment. The Defendant Police Officers seek summary judgment on Count I. The Defendant City of Chicago seeks summary judgment on Count II. Both motions have been fully briefed and they will both be addressed in this opinion. For the reasons set forth below, the Defendants' Motions for Summary Judgment are granted.

1

88

I. **FACTS**

Plaintiff Gordon Anderson ("Mr. Anderson") is the father of Plaintiff Crystal Anderson ("Ms. Anderson").[1] Mr. Anderson was the owner of a residence at 4049 W. Patterson. The residence at 4049 W. Patterson consists of a basement unit, a first-floor unit, and a second-floor unit. (Pl. Aff. Opp. Summ. J., Ex. 10 at 31, lines 18-21.) The basement level of the residence is divided into a living unit at the front of the building, and a smaller common area at the back of the building containing, among other things, a washer and dryer. (Pl. Aff. Opp. Summ. J., Ex. 10 at 29, lines 14–23.) At all times relevant to this case, Plaintiffs Gordon and Crystal Anderson resided in the second-floor unit; the first-floor apartment was occupied by Ms. Debra Singleton; and the basement unit was unoccupied.

On December 21, 1997, Chicago police officers responded to a complaint that Mr. Anderson had issued threats against Placko.[2] (Def. Officers Motion Summ. J., Ex. F) The police report indicates that Placko reported he was "involved in a long running dispute" with Mr. Anderson. (Id.) The police report also notes "Offender alluded [sic] to having numerous weapons in the house." (Id.) The responding officer urged Placko to obtain a restraining order against Mr. Anderson, but no further action was taken on the complaint. (Id.)

At approximately 1:15 p.m. on January 31, 1998, Defendant Joseph Gawlick, a Chicago Police Officer, received an anonymous call from a concerned citizen that Mr. Anderson was stockpiling weapons in the basement of the building at 4049 W. Patterson. (Def. Officers

---

[1] Unless otherwise noted, the facts provided here are undisputed.

[2] Mr. Placko was originally named as a defendant in this lawsuit. The complaint against him was dismissed by order of this court on February 29, 2000. See Mem. Op. of Feb. 29, 2000.

2

Motion Summ. J., Ex. G at 26, lines 11–17.) At that time, Defendant Gawlick was a Sergeant in the Gang Team Tactical Unit in the 17th District of the Chicago Police Department. (Id. at 25, lines 13–14). In response to this phone call, Defendant Gawlick "called in officers off of the street from my unit to formulate a plan of going over to this house and seeing Mr. Anderson." (Id. at 27, lines 7–10.)[3]

Thereafter, the six Defendant Officers, Jesse Eng, Janine Hermonn, Mark George, James Tarara, Michael Rice, and Joseph Gawlick, went to the residence on 4049 W. Patterson. None of the Defendant officers were in uniform. It is fairly contested whether the Defendants could see the weapons through the window into the basement of the residence. (Compare Def. Officers Statement of Uncontested Facts No. 15 with Pl. Aff. Opp. Def. Motion Summ. J., Ex. 10 at 32, lines 6–24 and Def. Officers Motion Summ. J., Ex. C at 160, lines 20–24.) At least two of the Defendant officers knocked on the front door of the building and Ms. Singleton, the first-floor tenant, let them in. (Def. Officers Motion Summ. J., Ex. D at 27, lines 3–8.) Ms. Singleton let at least two of the Defendant Officers into the basement of the residence. (Id. at 7) She also told them where to find Mr. Anderson's guns in the basement. (Id. at 28.)

---

[3] At some point, Mr. Anderson's neighbor Debra Singleton also called the police to report the presence of guns in the basement of the residence. On the record before the Court, the Defendant Officers have not placed Ms. Singleton's phone call into any timeframe. Since Mr. Anderson was collecting weapons for some years, it adds nothing to know that Ms. Singleton at some undisclosed point in time informed the police of the gun collection. Defendant City, to whom this fact is irrelevant, included in its exhibits deposition transcripts testimony that narrows the time frame to between January and March 1998 (Def. City Motion for Summ. J., Ex.5 at 85, lines 19–22), but if the phone call occurred after January 31, 1998, it is irrelevant to the Fourth Amendment issue. This is but one example of how the Defendant Officers' practice of submitting partial facts based on portions of deposition transcripts is unhelpful.

Meanwhile, four or five officers knocked on the front door of Mr. Anderson's apartment.[4] (Def. Officers Motion Summ. J., Ex. C at 156.) At the time, Ms. Anderson was not at home and Mr. Anderson was sleeping. (Id.) When he answered the door, the Defendant officers demanded to be let in, claiming to have a warrant for Mr. Anderson's arrest. (Id.) When they were unable to produce the warrant (which they never had), Mr. Anderson told them, "No warrant, leave", and closed the front door. (Id.) Mr. Anderson then attempted to return to sleep.

A few minutes later, Mr. Anderson heard his dogs barking at the back door. (Id. at 165.) Four of the Defendant Officers knocked at the back door of Mr. Anderson's apartment. (Id. at 166.) Again, Mr. Anderson asked the officers if they had a warrant. When they informed him (truthfully this time) that they did not have a warrant, he again told them to leave and attempted to close the door. (Id. at 167.) Defendant Gawlick stuck his foot between the door and the door jamb to prevent Plaintiff from closing the door. (Id. at 167.) Next, Defendant Gawlick "pulled out a snub-nose revolver. . .pointed that just close enough to the door, said that if [Mr. Anderson] didn't let him in, he was going to knock the door down and start shooting the dogs." (Id.) Mr. Anderson, fearful that either he or his pets were about to be shot, permitted the Defendant officers access to his apartment at that point. (Id.) Once the Defendant officers were in the apartment, they immediately handcuffed Mr. Anderson and placed him under arrest. (Id. at 168.) The Defendant Officers told Mr. Anderson that they had found his guns in the basement. (Id. at 172–73.) Mr. Anderson was told that he was being arrested for illegal possession of firearms. (Id. at 173.)

---

[4]It is unclear from the record Defendants submitted in support of their Summary Judgment Motion whether the officers went to Ms. Singleton's apartment before or after going to Mr. Anderson's apartment.

4

After arresting Mr. Anderson, the Defendant Officers asked him if he had any more guns in the apartment. (Id. at 172.) Mr. Anderson told them that there were some in a gun case in his office. (Id.) The Defendant Officers proceeded to search Mr. Anderson's apartment. From the basement and the apartment, the Defendant Officers seized thirty-two weapons from 4049 W. Patterson on January 31, 1998. The weapons were assigned inventory numbers by the Chicago Police Department, ranging consecutively from 1937601 to 1937633. (Pl. Comp. Ex. A.) The Standard Operating Procedures of the Chicago Police Department require the weapons to be transfered to the "gun vault" at 1011 South Homan in Chicago. (Def. City Statement Uncont. Facts No. 21.)

Later on January 31, 1998, Defendant Officer Mark George executed thirty-two quasi-criminal complaints charging Gordon Anderson with "Failure to Register Firearms" in violation of Section 8-20-040 of the Municipal Code of the City of Chicago. (Def. City Motion Summ. J., Ex. 7.)

At some point on January 31, 1998, Mr. Anderson's neighbor, Dane Placko, swore a criminal assault complaint against Mr. Anderson based on the events from December 20, 1997. (Def. Officers Motion Summ. J., Ex. K.) Mr. Anderson asserts that this complaint was signed and sworn to after the Defendant Officers came to his home. Defendants do not proffer a more specific timeframe for Placko's complaint. The assault charge against Mr. Anderson was eventually dismissed.

In the state court criminal action on the weapons charges, Mr. Anderson filed a motion to quash the arrest and suppress the evidence due to a Fourth Amendment violation. After a

hearing, the state court judge ruled on July 22, 1998 that "the Constitutional Rights of the Defendant were not violated." (Def. Officers Mot. Summ. J., Ex. L at 108, lines 11–12.)

On September 10, 1998, Mr. Anderson's defense attorney and a retained defense firearms expert inspected the weapons seized from Mr. Anderson's home. (Def. City Ex. 9 at 163–64.) Neither the Chicago Police Department nor the City's Municipal Prosecutions Unit placed a hold on the weapons pending the outcome of the trial. (Id. at 125–26.) In June 2000, personnel from the Evidence and Recovered Property Section of the Chicago Police Department destroyed Mr. Anderson's firearms pursuant to an adminstrative review and disposal process that dictates destruction of evidence retained on misdemeanor violations after 18 months. (Id. at 128–29.) The firearms were destroyed "in accord with the normal practice and procedure of the Evidence and Recovered Property Section." (Id. at 129.) At the time the firearms were destroyed, the officer who oversaw their destruction had no knowledge of the pending ordinance violation case and harbored no malice towards Mr. Anderson. (Id.)

Mr. Anderson was informed that his weapons had been destroyed by letter dated June 5, 2001. (Pl. Comp. Ex. A) Mr. Anderson then filed a motion to dismiss the ordinance violation complaint, alleging that the destruction of the weapons deprived him of an opportunity for a fair trial. (Def. City Ex. 11 at 2.) Although the state court judge was "trouble[d] . . . that the guns [we]re gone" (Id. at 15), he denied Mr. Anderson's motion to dismiss holding that the destruction of the weapons did not violate his right to a fair trial. The state court judge was uncertain whether the destruction of the evidence was in bad faith and decided "that's an issue that [Mr. Anderson] [could] raise with the jury", although the judge himself "d[id]n't see any showing of bad faith." (Id. at 18, lines 2–4;19, lines 16–17.)

On February 21, 2002, Mr. Anderson was convicted of 20 counts of Failure to Register a Firearm, and acquitted of 11 counts. (Def. Officers Mot. Summ. J., Ex. M at 163–66.)

## II. ANALYSIS

### A. Summary Judgment Standard

A party seeking summary judgment has the burden of showing that there are no genuine issues of material fact that would prevent judgment as a matter of law. Fed. R. Civ. P. 56. When reviewing a motion for summary judgment, the Court will "view all facts and draw all inferences in the light most favorable to the non-moving party." Chortek v. City of Milwaukee, 356 F.3d 740, 745 (7th Cir. 2004). Although the non-moving party benefits from inferences in its favor, where the moving party has submitted sufficient evidence in support of its position, the non-moving party must come forward with evidence on which a reasonable jury could return a verdict in its favor.

### B. Count I: Fourth Amendment Violation

Count I of Plaintiffs' Complaint asserts that the conduct of the Defendant Officers violated the Fourth Amendment rights of both Mr. Anderson and Ms. Anderson. Defendants assert that they are entitled to summary judgment on Count I for two independent reasons: (1) qualified immunity and (2) collateral estoppel. The Court will address those contentions here.

#### 1. Qualified Immunity

The Defendant Officers assert that they are entitled to qualified immunity on the alleged Fourth Amendment violation. To determine whether the defendants are eligible for qualified immunity, the Court must undertake a two-step analysis. As an initial matter, the Court must determine whether the alleged conduct, if proved, would constitute a constitutional violation. If

the conduct would violate the constitution, the Court must determine whether the constitutional standards were clearly established at the time of the violation. See Payne v. Pauley, 337 F.3d 767, 775 (7th Cir. 2003). When determining whether the right was clearly established, the Court asks whether it would be clear to a reasonable officer that his conduct was unlawful in the situation that confronted her. Id. at 775–76 (citing Saucier v. Katz, 533 U.S. 194, 202 (2001)).

### a.  Did the Officers conduct, as alleged, violate the Fourth Amendment?

"When determining whether a police officer's conduct violates the Fourth Amendment, we must determine (1) whether the conduct constitutes a search or seizure; and, if so, (2) whether the search or seizure was unreasonable." Dunn v. City of Elgin, Illinois, 347 F.3d 641, 648 (7th Cir. 2003). The conduct of the Defendant Officers was undisputably a search and, with respect to Mr. Anderson, also a seizure. The more salient question belongs to the second half of the inquiry: was their conduct reasonable?

Before the police entered the Anderson residence, they were apprised of two pieces of information: (1) Mr. Anderson was the subject of an assault complaint from December 1997; (2) there were a number of firearms in the basement of the residence. This information may have been sufficient to give rise to probable cause to search the Anderson residence, but the Defendant Officers would need to obtain a warrant to execute the search unless an exception to the warrant requirement obtains. When they appeared at Mr. Anderson's door, he twice denied them access to his home unless and until they obtained a search warrant, which is his right. His conduct is not alleged to have been threatening.

At that point, the Defendant Officers were required to obtain a search warrant if they wanted to search the residence. They did not do so. Instead, the Plaintiffs allege (and these

8

allegations are undisputed) that one of the Defendant Officers placed his foot between the door and the doorjamb, unholstered his firearm, and threatened to shoot one of Mr. Anderson's pets if he did not give them access to his home. Taking the facts in the light most favorable to the Plaintiffs, as the Court must at this stage, it is clear that the conduct of the officers was unreasonable. Threatening to shoot the pets of citizens in order to obtain access to their homes is beyond all reason.

### b. Did this behavior violate clearly established Fourth Amendment law?

Even though their alleged conduct would violate the Fourth Amendment, the Defendant Officers would still be entitled to qualified immunity unless their behavior violated clearly established standards of Fourth Amendment law. In the murky waters of Fourth Amendment jurisprudence, there are a few bedrock principles. One of those principles is that a person's home is a private space that merits the highest level of protection the Fourth Amendment affords. The United States Supreme Court recently reiterated that "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion stands [a]t the very core of the Fourth Amendment." Groh v. Ramirez, 124 S. Ct. 1284, 1290 (2004) (internal quotations & citations omitted). For almost twenty-five years, the U.S. Supreme Court has been extremely clear that warrantless searches and seizures inside a home are presumptively unreasonable. See Payton v. New York, 445 U.S. 573 (1980).

The Fourth Amendment means nothing if a citizen cannot demand the police obtain a search warrant before searching his home. There are exceptions to the warrant requirement, of course, (most notably the exigent circumstances exception which the state court found to obtain in this case) but on the record presently before it, this Court cannot find that any exception

would obtain.[5] This Court is confident that the alleged conduct of the Officers in this case violates clearly established Fourth Amendment principles. Therefore, the Defendant Officers are not entitled to qualified immunity.

### 2. Collateral Estoppel

Defendant Officers assert that the state court determination that their behavior did not violate the Fourth Amendment should preclude the Plaintiffs from litigating the issue here. They seek to preclude the Plaintiffs under the doctrine of collateral estoppel. "Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." Montana v. United States, 440 U.S. 147, 153 (1979).

When assessing the preclusive effect of a state court judgment in a federal case, the district court applies the collateral estoppel principles of the state in which it sits. See Brokaw v. Weaver, 305 F.3d 660, 669 (7th Cir. 2002) ("the preclusive effect of a state court judgment in a federal case is a matter of state [law] rather than of federal law"). "Under Illinois law, collateral estoppel requires that: (1) the issues decided in the prior adjudication are identical to issues presented for adjudication in the current proceeding; (2) there be a final judgment on the merits; and (3) the party against whom estoppel is asserted was a party or in privity with a party in the prior action." Kalush v. Deluxe Corp., 171 F.3d 489, 493 (7th Cir.1999).

---

[5]This Court has not had the benefit of an evidentiary hearing into this matter, neither have the Defendant Officers provided it with a full transcript of the state court evidentiary hearing.

10

Although the determination of whether the Defendant Officers conduct violated the Plaintiffs Fourth Amendment rights is a mixed question of fact and law, collateral estoppel can apply to such mixed questions when the "historic fact setting was complete by the time of the first adjudication." 18 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 4425, at 643 (2002). In this case, the predicate facts for the Fourth Amendment violation were established at the time of the state court suppression hearing. Furthermore, following the Supreme Court's holding in Allen v. McCurry, 449 U.S. 90 (1980), the Seventh Circuit clearly holds that "[c]ollateral estoppel can be used to bar a § 1983 claimant from relitigating a Fourth Amendment search-and-seizure claim that he lost at a state suppression hearing." Scott v. Sutker-Dermer, 6 Fed. Appx. 448 (7th Cir. 2001) (citing Allen v. McCurry, 449 U.S. 90 (1980)). If the elements of collateral estoppel are met, then this Court must accept the state court's determination of the Fourth Amendment issue, which would require summary judgment to be granted to the Defendant Officers. See 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2735, at 287 (1998) (declaring that "a rule 56 motion often is the most appropriate vehicle" for collateral estoppel claims).

As to Mr. Anderson, it is clear that all the elements of collateral estoppel are present in this case. In the state court action, Mr. Anderson sought to quash his arrest and suppress the weapons that the officers seized in the search of his home on the grounds that the arrest and the search violated his rights under the Fourth Amendment; this is the identical issue he seeks relief on here. After an evidentiary hearing, the state court judge ruled that neither the search nor the seizure violated Mr. Anderson's rights; this is a final judgment on the merits of the issue. Since

11

Mr. Anderson was a party to the state court action, collateral estoppel bars him from relitigating the issue here.[6]

Ms. Anderson, however, was not a party to the state court case. She was not charged in that action and she did not have the opportunity to litigate the issue on her own behalf. She can only be bound by the previous judgment if she is in privity with Mr. Anderson. "Although 'strict identity of the parties is not necessary to achieve privity[,] . . . the parties must be so closely aligned that they represent the same legal interest.' Kunzelman [v. Thompson], 779 F.2d [1172,] at 1178 [(7th Cir. 1986)]." Kraushaar v. Flanigan, 45 F.3d 1040, 1050 (7th Cir. 1995) (applying Illinois law). The person to be bound, whether a party or their privy, must have "had a full and fair opportunity to litigate" the issue, as well as an "incentive to vigorously litigate in the former proceeding." Talarico v. Dunlap, 685 N.E.2d 325, 328 (Ill. 1997). Even when all the collateral estoppel requirements are met, the Illinois high court has cautioned that "the doctrine should not be applied unless it is clear that no unfairness will result to the party sought to be estopped." American Family Mut. Ins. Co. v. Savickas, 739 N.E.2d 445, 451 (Ill. 2000).

This Court finds that the previous state court action will also estop Ms. Anderson from contesting the Fourth Amendment issue in this case. Under the Fourth Amendment, her interests in protecting her home from illegal searches and seizures are perfectly co-extensive with her father's interests. The facts on which to base the decision are identical to the facts in the state court determination. At the state court evidentiary hearing on the Fourth Amendment issue, the state court heard testimony that Ms. Anderson was present and very frightened when the

---

[6]Plaintiffs do not allege that the state court did not afford them a full and fair hearing on this issue, they merely assert that the state court was wrong. Such an assertion is insufficient to defeat summary judgment based on collateral estoppel.

12

Defendant Officers came to the house. Although the state court judge did not find this testimony credible (and for good reason, as Plaintiffs have abandoned their contention that Ms. Anderson was present during the search and seizure), this testimony nevertheless forced consideration of Ms. Anderson's privacy interest during the previous proceeding. Moreover, Mr. Anderson's incentive to litigate the issue vigorously in the prior proceeding was quite strong owing to the pending criminal charges. Since the legal inquiry would be identical for both Plaintiffs and the previous proceeding did include evidence of harm to Ms. Anderson's interests, this Court can detect no unfairness to Ms. Anderson from applying collateral estoppel to her claim as well.

Under the circumstances of this particular case, this Court finds that Ms. Anderson was in privity with her father, and she is fairly bound by the previous determination. See Henderson v. Stone, NO. 87 C 2775, 1989 WL 81818 (N.D. Ill. July 11, 1989) aff'd 930 F.2d 25 (7th Cir. 1991) (table) (holding that collateral estoppel is appropriate against criminal defendant's wife where her interests were presented at the state suppression hearing).

Since both Plaintiffs are fairly bound by the earlier state court determination, they are prevented from relitigating here whether the Defendant Officers' conduct violated their Fourth Amendment rights. Consequently, the Plaintiffs are unable to prove that the Defendant Officers violated their rights under the Fourth Amendment, so the Defendant Officers are entitled to summary judgment on Count I of Plaintiff's Complaint.

### C.     Count II: Due Process Violation

Count II of Plaintiffs' Complaint asserts that the City's destruction of Mr. Anderson's weapons violated his rights under the Due Process Clause. In the response to the Defendant City's Motion for Summary Judgment, Mr. Anderson asserted for the first time claims relating to

13

the delay in the criminal proceeding and a claim under the Fifth Amendment's Takings Clause. When this Court denied Defendant's Motion to Dismiss, it clearly held that Count II of Plaintiff's Complaint stated only a due process claim relating to the destruction of evidence. If Plaintiff disputed that interpretation of the Complaint, Plaintiff should have filed a Motion to Reconsider. Having failed to do so, Mr. Anderson forfeited the ability to seek relief under any other theory.

There are three elements to this due process claim: (1) the exculpatory value of the evidence must be apparent before its destruction; (2) the defendant would not be able to obtain comparable evidence by other reasonably available means; and (3) the destruction was in bad faith. See United States v. Aldaco, 201 F.3d 979, 982–83 (7th Cir. 2000) (citing United States v. Watts, 29 F.3d 287, 289–90 (7th Cir. 1994)).

In this case, the element of bad faith is determinative. Defendant City has proffered competent evidence that the destruction of the weapons was not in bad faith. See Def. City's Motion Summ. J., Ex. 9 at 129. Mr. Anderson has provided nothing that would rebut that evidence. Since bad faith is an essential element of Plaintiff's claim in Count II, there is no evidence in the record upon which a reasonable jury could return a verdict for the Plaintiff on Count II. The Court finds that the Defendant City is entitled to summary judgment on Count II.

## CONCLUSION

For the reasons set forth in this opinion, the Court grants both Defendants' Motions for Summary Judgment.

**Enter:**

_____
**David H. Coar**
**United States District Judge**

**Dated:   March 25, 2004**